Good morning. May it please the Court, my name is Margaret Raccone. I represent Marlon Wilson in this matter. The issue, the certified issue before the Court today is whether Mr. Wilson's trial attorney misadvised him regarding his parole eligibility. If you heard the last case, this seems to be somewhat different in that here there was an evidentiary hearing. There's a sharp conflict between your client and his counsel as to what counsel told him, the district court listened or the magistrate listened to the testimony and credited the counsel. And if that's true, if he was right to credit counsel, you lose, right? Well, in this case, he also found that my client was credible. He also found that Mr. Wilson was not lying in his testimony. And if you look at the evidence that – if you look at the testimony of Mr. Goldberg, you see that it's mostly habit evidence. He doesn't have any independent recollection whatsoever of what kind of parole eligibility advice he gave Mr. Wilson. And habit evidence is just circumstantial evidence. And the Court does find that my client was laboring under the misconception that he was going to get halftime. So in this situation, also we're going to have to look at the evidence that Mr. Goldberg found that he had communicated the facts accurately to your counsel. Are you saying that that finding cannot be sustained because the testimony of the lawyer is insufficient to when he's – that it was based on his general custom and that – and if a lawyer comes in and says, I never do this, this is what I always tell him, I wouldn't have told him that. And that that's insufficient to sustain this type of a finding? Well, I think it's circumstantial evidence. So – Well, okay. But is the answer yes, it is insufficient to sustain the finding? I mean, I guess it would be sufficient, except that in this case, the Court also found that Mr. Wilson believed that he was going to get halftime. And – Does that really get you to ineffective assistance of counsel, though? I mean, in the last case, we're talking about prejudice, and that's a whole different issue. Here, we're talking about ineffective assistance. So if the trial court says, we believe the lawyer when the lawyer said that he told him, what do we do with that if that's true? Well, under Chacon v. Wood, this Court said that when considering an ineffective assistance of counsel claim, the focus has to be on the assistance actually received by the dependent. And in this case, if you look at the circumstances around this plea, he really must have failed to properly advise him. If he was laboring, first of all, under the misconception that he was going to get 50 percent, this agreement was presented to Mr. Wilson on the day that the plea was taken. But let me, perhaps you use a hypothetical. Let's say that the lawyer's performance was letter-perfect, and he didn't know that the client didn't quite understand it. Later, it turns out the client didn't. How can we say that the lawyer's performance was ineffective constitutionally? I think under the principles of, for example, in the Chacon v. Wood case, this Court found that just the interpreter in that case misrepresented the plea advice and the parole eligibility advice. And the Court said that we have to look at the assistance that the defendant  And the lawyer's performance was letter-perfect. Right, but there was an active misrepresentation here, there, in that case. Here, there's no misrepresentation, according to the facts as found. Right, we don't need an actual misrepresentation. But we can see from the record that he presents the plea agreement to him in the morning. It's an a.m. session. It's an 830 a.m. plea session, that he speaks to him in the holding tank for who knows how long he had time to speak to him in the holding tank. And after, he was very reluctant to go forward. They argued. And then five minutes later, according to Mr. Wilson, he's up in front of the Court pleading guilty, changing his plea, and they have to stop three times during that plea colloquy so that Mr. Wilson can discuss the plea with his lawyer, and the second and the third times that they stop. It's a good thing for him. He went through. He might have been like the guy in the last case, where the bill slipped away, and then he'd be looking at 35 for life. Well, right. And if I can consider myself an incredibly lucky man to be where he is. Well, he has served six years of the nine years. Six years looks a lot different from 35 for life. That's true, Your Honor. But in this case, he did testify that the deciding factor for him to plead guilty was the parole eligibility, and that he could be home with his son in five and a half  I mean, he had just gone through a trial where the jury deadlocked 11 to 1 for guilt. Correct. If that's not a sobering reality, and if that 12th juror had gone the other way, hadn't held out, and he'd been convicted, which easily could happen in the next case, he'd be looking at 35 for life. He would never see his son again, or as a child, or maybe possibly not ever see the light of day again. I mean, never get out of prison. I can certainly understand why counsel in this case struggled mightily with his client to get him to accept the deal, and I have a very hard time believing that the deciding factor in this was the question of whether he'd get parole in 5.5 years or 8.5 years. I just, when the stakes are, I mean, he came yay close to falling off the edge into essentially never to be seen again by the California prison system, never to be seen again, and he escaped by the skin of his teeth. You know, I think that the magistrate was unnecessarily kind to your client in his report when he said he didn't want to say he was lying. He obviously thought he was lying in part in his testimony when he said that your client said that his lawyer told him he'd throw the case, he'd sit on his hands, he wouldn't defend him. And the lawyer did remember clearly that he didn't say that, and clearly the magistrate didn't believe that, or he would have had ineffective assistance with counsel. So he did, without saying it, find that he lied about half the story. Well, he did, excuse me, he did, I mean, he did find that he was credible on many issues. He did not specifically say anything about that issue. But we do know that in the plea colloquy, the first thing that my client had trouble with was whether or not he'd been threatened in any way to take the agreement. And so your client now wants to go back and go to trial on this case? My client believes in his innocence, and this was a date rape case. And probably the lady is no longer available to testify. Well, that's another issue that wasn't certified, the Brady issue. No, but I mean, if there were to be a new trial. Right. She's no longer available. In fact, the prosecutor never let my client or his counsel know that she was unwilling to go forward, that she was going back to Japan and she was unwilling to go forward. She didn't go back, I thought, until after the plea. I'm not sure about the exact timing of it. That could be. And the prosecutor says that he did not say that she wouldn't testify again. She did. That's what he said at the time. We don't know now. And he goes back to trial. You don't know whether she'll testify or not. He wants a new trial. He could get more time. That's a risk. Right. Well, he's thought through that. I mean, now. Yeah. Now we know. Let me put it this way. If my client would have known then that the only other precipient witness in this case was not going to testify at a retrial, he would not have taken this plea agreement. He would have gone to trial. Couldn't they introduce her evidence from the testimony from the first trial if she were unavailable? Well, sure. There would have to be an unavailability hearing. Yeah. So if she's in Japan, her testimony comes in from the first trial. But, I mean, I guess to cut to the chase and not to violate any confidences, but he's aware this time what he seeks is to go to trial. And if it may result in him getting more time if convicted, it's a risk. Under. And then we'll be back on ineffective assistance of counsel. Well, under O'Toole v. Osborne, the Fourth Circuit, when they granted relief in a case like this, they sent it back and gave the State the option of reducing the sentence. I assume you've told him if he goes, if he wins this case, he can get 35 years to life. I've told him that. But I guess I would ask this Court to follow the O'Toole Court, which will. Well, you say so now, but who knows what you really said. Let me ask you about one of the uncertified issues. And I, the government hasn't had a chance to respond and may not be able to respond now. But I just like to understand your position on it on the on the destruction of the of the U.N. evidence and expert. But there's a sort of a cluster of issues dealing with that. I'm not sure I fully understand the sequence of events here. Can you just lay it out for me in terms of the samples that were taken? Yeah. Why don't you start with her being in the hospital and. At St. Joseph's Hospital, she was, she, she, she, how did she wind up there? I believe it was a roommate who took her there because she was. So she gets taken home by the defendant to a friend's house. Yes. To a friend's house. And then the first thing, the next thing she remembers is she is there in the hospital. Exactly. And so, so, so, so, okay, so, so take it from there. Yeah. So, so she's given a pelvic exam or something like that. Yes, she was by Dr. Wells, who didn't find that she was a sexual assault victim. And she gets a blood sample taken, a urine sample taken. Then she. Any value found in those things? No, no, Your Honor. There's one sample that all of the actually all of the urine and blood samples in this case were destroyed or lost. But there is a report with respect to the fact that she had a blood alcohol content of, I think it was 0.287. But there were no drugs found in her system. So, so, so move forward a little bit. So when are these things lost, destroyed vis-a-vis the first trial, vis-a-vis the pre-bargain? I'd like to sort of understand what your plan is. Okay. Well, the blood and urine evidence from the first hospital, St. Joseph's Hospital, was either lost. So it was blood, urine and blood taken. Yes. Okay. Yes. Okay. Both. That there was testimony at the trial that both of those samples, the blood sample, I guess the vial was contaminated or something. So the defense could not, was not able to test that. The urine sample was destroyed or lost as well. Then her roommate, when she, after she went home, the roommate started suspecting that something was wrong and took her to the California hospital, medical hospital, and he brought a urine sample along. Nobody really seems to know what happened to that sample. They also took another urine sample there, and that was also lost or destroyed. So I, there was a, there was sort of a, from about a hearing at the trial with respect to whether or not, you know, any of the evidence, the blood evidence or anything, could be let in. And, and the claim here is that. No, what happened at the first trial? At the first trial. What was let in? Or at the trial, rather. Just at the trial, it was the vial, the blood evidence that had the blood alcohol content in it. Was let in? Wasn't let in? It was. Well, not the vial. You don't know. Not the vial. The results. Excuse me. Yes. Everything was destroyed, basically. Everything. So what you have is a report from the state. That's all. Yes. And the report said what it said. And by the time of the trial, there was no way of testing. There was no way of testing. Testing any of these things. And they heard from Bella Hearing and found what? This was inadvertent or what? I specifically, I think, I believe that, I can't remember exactly, but the fact that she had blood alcohol content evidence was admitted in terms of what was, what the blood alcohol content was. And what it showed was no valium or no drugs. That's right. And .3 or something like that. Alcohol. And then there was a testimony that she had one drink with defendant. That's correct. So the inference would have been that she must have been boozing it up pretty good earlier in the day. That's right. That her testimony wasn't accurate with respect to. And all of this came out during the first trial? No, actually, that didn't come out during the first trial. What didn't come out? Whether or not, because Mr. Goldberg had not hired a toxicologist or anyone to testify with respect to the blood alcohol content and how many drinks she must have had and the burn off rate and all those things that did not come out of the trial. Just the fact that she was intoxicated in the actual blood alcohol level. That was admitted. And what is exactly the uncertified claim with respect to these things? Given that the first trial resulted in a hung jury and. You had a plea bargain here and plea bargains often wash out things. Is the claim that had he but had a better lawyer, he would have gotten acquittal the first time around? I'm trying to understand what the context of the claim is, which is difficult given that it wasn't certified, but nevertheless. Right. Well, I guess the way that I would have to couch this is that there are several instances of ineffective assistance of counsel here. In the first trial? Well, that ultimately led to my client's plea in this case. And that in a cumulative sense that this Court should find that there was ineffective assistance of counsel. But I'm trying to understand. Put away the first trial. I mean, put away. Let's say they have not been the first trial at all. And you were here at the plea bargaining stage and you had this set of circumstances that you complain about. They didn't get an expert. You know, the evidence was destroyed. You've got sort of this inconsistency. What effect does it have? He has a plea. He took a plea. Right. Well, so what? Let's say all these things are true. How much most claims are waived when you take a plea and you don't have to have effective counsel and everything in order to get a plea bargain. That's how would this have affected the whole plea bargain process? If let's say counsel had been more effective, or let's say the evidence had not been destroyed, or counsel had gotten an expert, what difference would that have had on the plea? Under Hill v. Lockhart, I mean, we can look at, I mean, just a basic and effective assistance of counsel claim. We can look at whether or not the trial lawyer investigated properly, whether he did everything that he needed to do before advising the client to plead guilty. So I guess that's really what it hinges on. That in this case, he didn't he didn't he didn't speak with an expert. He didn't he could have given him a better, more informed advice saying we can, you know, we have an expert that will give you a pretty good chance at being acquitted on a retrial. Correct. Yes. All right. Thank you. You know, I've asked these questions, but under our rules, the government hasn't had a chance to respond. So I'm not going to expect opposing counsel. But I just want to understand this. If if we are interested in these issues, we will obviously issue an order and give the state a chance to respond. We're not at that point yet. So just a moment of rebuttal time as well. We'll see if it's it's been you've had almost double your time already. Okay. Thank you. Good morning, Your Honor. Deputy Attorney General Stephen Mercer for responding. This claim succeeds or dies with the factual allegation of being advised that Wilson would only do half of his time. The evidence you're hearing was held on that. The district court found a dispositive credibility determination that I'm quoting petitioner has failed to persuade this court that he received this advice from counsel. Petitioners counsel testified he never told petitioner he would be eligible for parole in five and one half years. This court finds that counsel's testimony was credible. And the issue for this court is a narrow one. Does that credibility? Is that credibility finding clearly erroneous? Does evidence support the district court's credibility finding and would point out that the district court is the only court to date that had the benefit of actually observing live testimony from these witnesses to observe the demeanor, the mannerisms, etc. Is Judge Reinhart correct when he when he suggests that although the magistrate judge said Mr. Wilson is not a liar, this was just being polite, that he must have found it to be not credible, at least part of the story and probably all of the story. Well, I think he clearly did not find him credible as to his allegations of the attorney saying he would sit on his hands, etc. I think the district court, quite frankly, said I'm faced with a situation where I need to weigh the credibility where we have, you know, he doesn't have direct evidence that Wilson is lying to the court, despite his, you know, his bias to do so. But, you know, we have a jury instruction in California that goes to exactly that point that says different recollections of events are common by the same people. And the point isn't how many witnesses or what the evidence is. The point is the overall convincing force of the evidence. The district court was faced with making that determination here. He looked at the evidence before him. He weighed the testimony. He said I find counsels credible that he never gave this advice to Wilson. And furthermore, I find it based, it's supported by the following, that he has 30 years of experience, that he's done thousands of these criminal cases. He was well aware of the law at the time. And while, although faced with a difficult decision, clearly the petitioner has not met his burden of persuasion here. And I would point out that it's, in the appellant's opening brief, they say, well, if neither side is lying or if neither side is totally credible, then Petitioner wins. Then Petitioner has proven his case. And that's not the standard. He's, that means he's failed to show that by a preponderance of the evidence that he is the only one credible. As fast as a. It's a strange case where two sides give mutually consistent story, but both of them are credible. Sure, absolutely. And along those lines, I would be, frankly, much more suspicious of an attorney who got into court and said, out of the thousands of my client, I specifically remember telling him what his parole eligibility might be in this particular case. That's not necessarily what we would expect from people. He might. Years ago, he might make a note in his file. I'm not saying he should. I'm not saying that it's necessary for a lawyer to do so, but it's certainly possible for a lawyer to write a little note as an aid to memory and say, oh, you know, when I looked at the note, it brought back the case. But it was also reasonable here for the district court to believe him when he says, I may not remember giving that specific advice, but I am positive. I never said something like that. That's an outlandish statement that I would never make. And for the district court to find that credible and when that factual allegation fails, then it's hard to understand how you could also find the person who said he did tell it to me credible. I'm not saying he did say he was credible, but I'm saying it's difficult. It's not impossible for them both to be credible. That's correct. But I think there's a difference between credibility and coming to court and deliberately, affirmatively deceiving the court. The district court surmised why Petitioner may be under that misconception, and it didn't stem from counsel's advice. He surmised. No, you could be under that impression, but you couldn't be under the impression your lawyer told you that. Correct. But the only way he could be under that impression from his lawyer is if his lawyer told him that. Right. In which case he couldn't have the first finding. Right. And that didn't happen here. And again, in terms of what the Court looked at here, he said, given the first situation, the 11 to 1 for guilt, this was the only objectively reasonable course of action was to take this plea. But again, based on the narrow issue, because the factual allegation fails, because that credibility determination is not clearly erroneous, relief should not be granted on this claim. If there are other questions that the Court would like to ask, I'd be happy to respond. Otherwise, I'll submit. Thank you, counsel. Thank you, Your Honor. All right. We'll give you one minute since it's a generous day today. I don't think you should get that much out of him. Well, I guess I would say that there's a failure to properly advise here. Mr. Wilson was laboring under the misconception that he was going to get 50 percent. This lawyer did not spend enough time with his client. He rushed him into this plea agreement on the same morning that he presented it to him. He was in front of the judge five minutes later. That's not uncommon, though, is it? Well, it would be for me. I wouldn't do it. And there was no reason why he shouldn't have put this plea over for another day so that the client could think about it, so that he could explain more thoroughly to him. And I think that under these circumstances he needs to send his lawyer a valentine. Under these circumstances, he was ineffective. Thank you. Thank you very much. The case disargued will be submitted.
judges: Reinhardt, Kozinski, Thomas